United States District Court
Eastern District of Michigan

United States of America,

    Plaintiff,

v.

Jeffrey Freeman

    Defendant,
_____/

No. 22-cr-20346

Hon. Paul D. Borman

## Government's Response to Defendant's Motion for Judgment of Acquittal on Count 1 (Tax Evasion)

The United States, by and through its counsel, hereby submits this Response in Opposition to Defendant Jeffrey Freeman's Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The evidence of Freeman's guilt on the tax evasion count far exceeds what would be necessary to enable a reasonable jury to return a verdict of guilty as to that charge. As the revenue agent testified, and as the law affirms, the $6.5 million of the victim's funds that Freeman appropriated from his attorney trust account and forwarded to a Swiss bank account is properly attributable as income to Freeman in 2013, the year of the embezzlement. Freeman willfully failed to declare that income on his 2013 income tax return, which

1

constitutes an affirmative act to evade the assessment and payment of the tax due and owing that year. Freeman's arguments should be rejected, and his motion denied.

## Relevant Evidence

There is a substantial body of evidence in the record that supports the allegation contained in Count 1 of the Indictment. Without attempting to be comprehensive, the government submits the following propositions have been established by the evidence presented at trial, viewed in the light most favorable to the United States:

- In approximately May 2012, A.V. ( hereinafter "victim"), a Canadian businesswoman, retained Freeman, a Birmingham, Michigan tax attorney, to assist her with a criminal tax probe being conducted by the IRS.
- In November 2012, the victim wired Freeman $15 million to Freeman's attorney trust account (IOLTA) at Charter One Bank, which the victim believed was to be sent from there on to the IRS. Freeman represented to the sender of the funds (the Perth Mint), as well as his own bank, that the funds would be turned over to

the IRS to deal with the victim's tax liability. *See* GX 4, 4A; DX 542.

- Freeman caused approximately $8.4 million to be paid over to the IRS shortly after receiving the funds, which resolved the victim's tax due and owing to the IRS. GX 49-52. Freeman kept the balance of the funds in his IOLTA account and informed the victim that he would work to get the penalties and interest "abated," meaning reduced or written off. The remaining $6.5 million remained in Freeman's IOLTA account.

- With information provided by the victim, Freeman and his staff prepared a detailed abatement letter, describing the victim's background, history of mental illness, and prior receipt of poor professional advice, in an attempt to get the penalties and interest reduced. It is unclear whether this letter was ever sent. GX 6A.

- No later than May 2, 2013, Freeman became aware that the victim's penalties and interest were deemed "uncollectable" by the IRS. GX 12A at Freeman_059.

- Freeman, the sole individual with signature authority on the IOLTA account holding the victim's funds, transferred $2 million

3

- to an account at HypoSwiss PrivatBank in Switzerland in the name of "Rozet Assets on May 15, 2013. GX 41 at Freeman_1299; GX 42.

- In approximately August 2013, Freeman informed the victim that he had settled her penalties and interest with the IRS for $6.5 million. The victim believed Freeman had provided these funds to the IRS to settle her tax account. In September 2013, Freeman provided the victim with a letter stating that all matters with the IRS "have finally been resolved favorably and all taxes have been paid in full." GX 7A.

- In October 2013, Freeman took an additional $4.5 million from the Charter One IOLTA account in which he held the victim's money and wired it to the same "Rozet Assets" account in Switzerland. GX 43.

- In May 2015, Freeman filed his joint federal income tax return for tax year 2013. That return did not declare or reference the $6.5 million of the victim's money that he appropriated from the IOLTA account and sent to Switzerland. GX 45.

4

- In May 2019, the victim, responding to questions from her Panamanian bank, got in touch with Freeman and asked for documentation of the $15 million Freeman had purportedly paid to the IRS on the victim's behalf. GX 9.
- After substantial back and forth via e-mail, Freeman responded to the victim with letters that provided false accountings of the $15 million. GX 15A, 19A. On May 30, 2019, Freeman provided the victim with an entirely fictitious breakdown of the "penalties and interest" purportedly paid to the IRS for tax years 2000-2002 on the victim's behalf. These seemingly random amounts, broken down by year, add up to precisely $6.5 million. GX 39A.

## Legal Standard

"The relevant question in determining the sufficiency of the evidence to support a guilty verdict is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Clark,* 928 F.2d 733, 736 (6th Cir. 1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A defendant bringing such a challenge bears a

"very heavy burden." *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir. 1986) (quoting *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)).

## Argument

The evidence presented at trial establishes that the funds that Freeman appropriated from the victim are properly attributable as income. Freeman embezzled the funds and had full and complete control over the funds the moment he removed them from his attorney trust account. The manner in which he elected to expend the funds he stole is not relevant to whether those funds constitute income to him. A more detailed discussion of these points is set forth below.

First, it is well-established that embezzled funds are taxable income to the embezzler of the funds. *See, e.g. James v. United States*, 366 U.S. 213, 219-21 (1961); *United States v. Guidry*, 199 F.3d 1150, 1157-58 (10th Cir. 1999); *United States v. Harris*, 942 F.2d 1125, 1134 (7th Cir. 1991). Embezzled monies are properly considered income in the tax year that the funds were taken without authorization. *See James*, 366 U.S. at 219-21; *United States v. Lippincott*, 579 F.2d 551, 552 (10th Cir. 1978).

The evidence that Freeman embezzled the victim's funds is overwhelming. First, the victim testified that she never authorized Freeman to send her funds to anyplace other than the IRS, has never heard of Rozet Assets, and has never seen a penny of the $15 million that she sent to Freeman in 2012 to address her tax liability. Further, the victim's claims are exceptionally well supported by the documentary record. In 2019, when the victim reached out to Freeman seeking documentation of the payments to the IRS, Freeman sent her a letter and IRS transcripts that documented only the taxes paid (not penalties and interest). GX 12, 12A. The victim followed up with edits, asking Freeman "Instead, perhaps attach another document showing there was a total payment of the approximately $15 million that was paid?" GX 13A. Freeman responded with a series of falsehoods, initially providing letters stating that all "$15 million" of the victim's initial transfer was used to pay taxes, penalties, interest, and related legal fees. GX 15A, 19A. He later followed up with an entirely fictitious letter purporting to document the "penalties and interest" paid on the victim's behalf for the three tax years in question. GX 39A. The fact that Freeman lied to the victim about what happened to her money strongly corroborates the

7

victim's assertion that Freeman took her funds without authorization. If the victim had authorized Freeman to send these funds to Switzerland, why would Freeman lie to her about it?

In addition, for money to be properly attributable as income to a taxpayer, the taxpayer must have control of the funds. "Income is taxable when the holder has such control over it that he has the freedom to dispose of it at will." *United States v. Toushin*, 899 F.2d 619, 622 (7th Cir. 1990) (internal citations and quotation marks omitted). In *Corliss v. Bowers*, 281 U.S. 376 (1930), the Supreme Court stated, "the income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income, whether he sees fit to enjoy it or not." *Id.* at 378.  A taxpayer's control over the funds is established "when he has the power to dispose of it." *Toushin*, 899 F.2d at 622, *citing Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955); *Helvering v. Horst*, 311 U.S. 112, 118 (1940).

In this case, Freeman's control over the victim's funds was <u>absolute</u> the moment he embezzled the funds from his IOLTA account. Freeman was the sole signatory on the IOLTA account into which the

victim transferred her funds. GX 41 at Freeman 1299. The moment Freeman took those funds, without authorization, out of his IOLTA account, Freeman had full dominion over the funds and exercised unfettered discretion in determining what to do with these monies. Freeman's control over the funds he embezzled is obvious from the trial record, and Revenue Agent Sue Carene's testimony properly applied these principles regarding control of funds in presenting her computation of Freeman's tax deficiency.

What the government need not show, however, is how Freeman <u>spent</u> the money he stole. There is no legal requirement that the government prove that Freeman spent the purloined funds for his own personal gain. For the victim's $6.5 million to be properly considered income to Freeman, the government need only show that he took the funds without authorization and exercised personal control over the funds when he did so. *See Wood v. Commissioner*, 102 T.C.M. (CCH) 146 (T.C. 2011) ("We agree with respondent. The Woods are confusing how the money was used with how the money was acquired. Mr. Wood misused his position at Helton to misappropriate the funds and used the money in whatever manner he chose. Because he had dominion over

9

the misappropriated funds from Helton, all of the misappropriated funds became part of the Woods' gross income."); *United States v. Martin*, 525 F.2d 703, 707 (2d Cir. 1975) (affirming jury instruction where "the court informed the jury that the government had to show unreported taxable income to Martin, but that it need not show how he had spent the money after it became income.").

The facts of the case of *Bailey v. Commissioner,* 52 T.C.115 (1969), *affirmed by Bailey v. Commissioner* 420 F.2d 777, (5th Cir. 1969), are instructive on this point. In this case, a woman ("Barbara") was employed at a Florida Bank. Barbara embezzled money from the bank and passed it on to her brother ("Melton") by making fictitious deposits into her brother's bank account. Barbara argued that the funds should not be considered taxable income to her, as she derived no personal gain from them. The Tax Court (and ultimately the Fifth Circuit) disagreed. The Court noted that "As the creator of the income, Barbara chose to place it at Melton's disposal . . . In all the transactions, Barbara exercised complete dominion and control over all the embezzled funds." *Id*. at 118-119. The court went on to state "Barbara's exercise of control over these funds is sufficient for them to constitute income to her." *Id*.

at 119. Personal use and enjoyment of embezzled funds is not determinative of whether such funds constitute income. <u>Control</u> of the funds is the key factor.

Once Freeman stole and exercised control over the funds, it does not matter whether he sent them to Switzerland, to a family member, spent them on himself, or sent them to his favorite charity. He controlled the stolen funds, and this is enough for those monies to constitute income as to him. *See, e.g., Estate of Geiger v. Commissioner*, 352 F.2d 221, 231 (8th Cir. 1965) ("The taxpayers' position in effect is that, technically, these funds flowed direct from the bank to the outside beneficiaries and did not pass through Geiger['s] hands . . . these beneficiaries were the objects of *her* bounty, not the bank's. She was the force and the fulcrum which made those benefits possible. She assumed unto herself actual command over the funds. This is enough.") (emphasis added).

Defendant's principal case citation, *Hobson v. Commissioner*, 63 T.C.M. 3085, is readily distinguishable from this case. In *Hobson*, the defendant, a bank employee, provided bank monies without authorization to cover potential overdrafts in customer accounts when

11

the customers were running low on funds. The employee would return the bank's funds once the customer(s) had sufficient funds of their own in the account. The customers recognized that they had a duty to repay the bank any money drawn on the accounts during the period when the bank funds had been provided to the accounts. The Tax Court held that this unusual fact pattern meant that the unauthorized use of bank funds was distinguishable from that of traditional embezzlement, because there was a "consensual recognition of an obligation to repay the funds." *See id* at 3. In other words, the facts of the case make clear that the "embezzlement" at issue was much more akin to a loan, because there was an understanding of an obligation to repay. The Tax Court properly held that the funds improperly fronted into the customer accounts did not constitute income to the bank employee, because the customers knew those funds "would have to be repaid to the bank." *Id.* at 4.

      In the Freeman case, there was obviously no "consensual recognition of an obligation to repay the funds." The victim testified that she was unaware of the embezzlement until she discovered it in 2019, and that she never authorized Freeman to do anything with those

monies other than to use them to settle her tax debt to the IRS. The victim did not "loan" Freeman $6.5 million. Freeman stole it from her and chose to send it to a Swiss account she knows nothing about. This constitutes income to Freeman under the operative definition of "income," and the evidence presented in this case is more than sufficient to obtain and sustain a conviction on the tax evasion charge.

## Conclusion

For the foregoing reasons, Freeman's Motion for a Judgment of Acquittal as to Count 1 of the Indictment should be denied.

Respectfully submitted,

DAWN N. ISON
UNITED STATES ATTORNEY

*s/John K. Neal*
Ryan A. Particka
John K. Neal
Assistant U.S. Attorneys
211 W. Fort Street, Ste 2001
Detroit, MI 48226
ryan.particka@usdoj.gov
(313) 226-9635

## Certificate of Service

I certify that on October 19, 2022, I caused this Motion to be electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorney(s):

Jeffrey A. Neiman
George B. Donnini
Brandon S. Floch
Derick Vollwrath
Attorneys for Jeffrey Freeman

                                         *s/John K. Neal*
                                         Assistant U.S. Attorney